UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

# FILED

SEP 24 2013

~~CLERK~~

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| BURTON LANDMAN, | * | CIV. 12-4082 |
|  | * |  |
| Plaintiff, | * |  |
|  | * |  |
| -vs- | * | MEMORANDUM OPINION |
|  | * | AND ORDER |
| CAROLYN COLVIN,[1] | * |  |
| Commissioner of Social Security, | * |  |
|  | * |  |
| Defendant. | * |  |
|  | * |  |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Plaintiff, Burton Landman ("Landman") seeks judicial review of the Commissioner's final decision denying him a period of disability commencing on June 16, 1996, and payment of disability insurance and medical benefits under Title II of the Social Security Act.[2] Landman has filed a Complaint and has requested the Court to enter an order instructing the Commissioner to award benefits. Alternatively, Landman requests the matter be remanded to the Commissioner for an unbiased, medically and legally sound evaluation of his case.

---

[1]Pursuant to 42 U.S.C. 405(g), Carolyn Colvin has been substituted for Michael Astrue as the named Defendant. Ms. Colvin became the acting Commissioner of the Social Security Administration on February 14, 2013.

[2]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified-- is that a claimant's entitlement to SSD/DIB benefits is dependent upon his "coverage" status (calculated according to his earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

Landman protectively filed his application for disability insurance benefits (Title II) on August 2, 2000. Landman's alleged date of onset is June, 1996 and his date last insured is December 31, 2001. The Court's review of Landman's medical condition will focus on that time period.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g).

## INTRODUCTION[3]

Landman was born in 1957 in Bethel, Alaska. He dropped out of high school and got married at age 17. He joined the Air Force in 1976 and obtained his high school diploma. He worked as an electronics technician while in the Air Force, but was discharged in 1983 after he sexually molested a child. He divorced his wife, remarried, and moved to Rapid City, South Dakota that same year. For the next ten years, he managed a movie theater. While in Rapid City, Landman completed three years of college at the South Dakota School of Mines & Technology. In 1994, Landman separated from his second wife and moved to Saint Paul, Minnesota. There he began working as a newspaper distribution manager. He quit that job in June, 1996. Some time in 1996, Landman was extradited back to South Dakota to face criminal charges for sexually molesting a minor relative. He was convicted on four counts of sexual abuse and sentenced to sixty years in the state penitentiary. He entered the South Dakota State Penitentiary in June, 1997. As of this writing, Landman remains incarcerated.[4]

## PROCEDURAL HISTORY

Landman filed his application for benefits in August, 2000. AR 48-50. In a form entitled "Disability Report–Adult" he filed in connection with his 2000 disability application (AR 74-83) Landman listed the following as illnesses, injuries or conditions that limited his ability to work: "respiratory: service connected COPD; bronchitis, sleep apnea, dizziness & hearing loss& tinnitus (acute), digestive problems(chronic care–stomach), shortness of breath." He described the manner

---

[3]The facts from this introductory section are gleaned from Judge Schreier's Opinion in *Landman v. Barnhart,* CIV. 05-4134, United States District Court, District of South Dakota.

[4]Although Landman is prohibited from receiving benefits while incarcerated, his children may be able to receive benefits. 42 U.S.C. § 402(x)(2); 20 C.F.R. § 404.468. *See also Dorsey v. Kurth*, 2009 WL 2884742 (E.D. Mo.) at *2, fn. 1; *Zipkin v. Heckler*, 790 F.2d 16, 19 at fn. 2 (2nd Cir. 1986).

in which his illnesses, injuries and conditions limited his ability to work as follows: "tire very easily-run out of breath even when not exerting myself. Stop breathing often due to frequent arousals from sleep apnea drowsy/sleepy during work hours–memory impairment. Frequent chest palpitations. Tension with (illegible)." He indicated he quit work in June, 1996. AR 75.

Landman's claim was denied initially on April 16, 2001 (AR 33), and on reconsideration on November 21, 2001 (AR 39-41). Landman requested a hearing (AR44-46) but later waived his right to a hearing (AR 47). Administrative Law Judge (ALJ) the Honorable Robert Maxwell decided the matter based on the administrative record. AR 508-517. On February 5, 2003, the ALJ issued a ten page, single-spaced decision affirming the previous denials. AR 508-517. On May 4, 2005, the Appeals Council denied Landman's Request for Review. Landman then filed his Complaint in the District Court on August 25, 2005. *Landman v. Barnhart,* CIV. 05-4134, United States District Court, District of South Dakota. On September 19, 2006, Judge Schreier entered an Order Reversing and Remanding the matter to the Social Security Administration for further consideration.

On remand, Landman's case was again decided by ALJ Robert Maxwell. Landman participated in his second administrative hearing unrepresented, via telephone. A medical expert (Michael McGrath, M.D.) and a vocational expert (Thomas Audet) testified during the hearing and were present at the hearing location with ALJ Maxwell in Sioux Falls, South Dakota. On April 18, 2008, ALJ Maxwell issued a sixteen page, single spaced decision which again denied Landman's request for benefits. AR 518-530. Landman requested review of ALJ Maxwell's decision by the Appeals Council. On June 15, 2009, the Appeals Council vacated ALJ Maxwell's decision based on the following: (1) because Dr. McGrath evaluated Landman earlier in connection with Landman's claim for VA benefits he should not have given testimony during the administrative hearing; and (2) the ALJ should have considered Landman's pedophilia and restrictions on interacting with children when determining his social functioning and ability to return to past relevant work.

The Appeals Council remanded Landman's case with instructions that it should be considered by a different Administrative Law Judge. AR 533. The Appeals Council also instructed

3

the next Administrative Law Judge to resolve specific issues about Landman's mental impairment and maximum residual functional capacity with the assistance of a medical expert and a vocational expert. AR 532.

Landman's next administrative hearing was held on September 25, 2009, before a different ALJ, the Honorable Lyle Olson. Landman again appeared via telephone but was represented by counsel. A medical expert (Kevin Schumacher, M.D.) and a vocational expert (Thomas Audet) also testified. On October 28, 2009, ALJ Olson issued a twenty-one page, single spaced decision which again denied Landman's request for benefits. AR 484-504. On November 20, 2010, the Appeals Council denied Landman's request for review. After receiving multiple extensions of time to file a civil action, Landman filed his Complaint in this Court on May 1, 2012. The matter is now ripe for decision.

## **FACTUAL BACKGROUND**

### A. **Medical Records**

Landman's medical records from the pertinent time period are summarized below:[5]

#### 1. **Saint Mary's Medical Center Emergency Room (August, 1996)**

Landman appeared in the Saint Mary's emergency room in Duluth, Minnesota on August 25, 1996. He reported bilateral elbow discomfort. AR 153. He reported he'd stopped smoking several years ago and as a result, had significant weight gain in recent years. He was currently taking several over-the-counter weight loss aids. Other than a past eye surgery he reported he was "healthy as a horse." *Id.* Landman was, at the time of his emergency room visit, in Duluth, Minnesota on vacation. An electrocardiogram was normal as was a cardiovascular exam. AR 154. The physician's impression was arm pain of uncertain etiology. Landman's history was not suggestive of coronary artery disease. *Id.* He was advised to make an appointment to see his family physician

---

[5]The medical records in the administrative record span a time period beginning when Landman was in the Air Force in the 1970's and continue until 2008. The records between June, 1996 and December 31, 2001 are emphasized because Landman asserts his disability began in June 1996 and Landman must prove he was disabled on or before December 31, 2001 (his date last insured) to be eligible for DIB benefits.

when he returned home.

## 2. Sioux Falls Veteran's Administration Medical Center (4/99-5/02)

Landman made a claim for service-related disability benefits in January, 1999. AR 273-277. Landman claimed service- related disability benefits for: nicotine dependence( AR 276); chronic bronchitis (AR 274-275); bilateral hearing loss (274);and tinnitus (AR 273) . The claims were denied.

Landman was examined by Mark Merke at the Sioux Falls VA Medical Center on April 6, 1999. AR 173-174. Landman claimed bilateral hearing loss since 1976. He reported trouble hearing conversations, the television, and radio. AR 173. He also reported tinnitus which he described as a "high- pitched , multi-frequency ring." Landman claimed his tinnitus caused trouble sleeping, reading, paying attention and listening. AR 174. The examiner determined that Landman's test reliability was "poor." *Id.* The examiner indicated Landman was "unwilling or unable to respond accurately to tester instruction and provide accurate audiometric threshold data." *Id.* In the "diagnosis" section of report, the audiologist wrote:

> Today's testing does not represent the veteran's true hearing acuity. Veteran is either unwilling or unable to provide accurate hearing threshold data. Veteran consistently responded to speech and pure testing well above his hearing threshold. Otoscopy revealed apparently normal ear canals and tympanic membranes. Immittence and audiometry and Dpoae audiometry suggest that veteran has normal hearing acuity up to about 4khz AU. Today's audiometric results suggest psuedohypacusis.[6] No follow up is necessary.

Steven Wilbur examined Landman for COPD, nicotine dependence and obesity on November 23, 1999. AR 166-169. Wilbur noted Landman was treated for an upper respiratory tract infection while in the service in 1977 and then again in 1980. AR 166. He was treated for tonsillitis in 1981 and strep throat in 1983. AR 167. Dr. Wilbur could find no documentation to support

---

[6]Psuedohypacusis refers to a person who presents with a hearing loss not consistent with clinical or audiological evaluation, without organic lesion. There are two types: (1) conscious which suggests purposeful malingering or feigned hearing loss and (2) unconscious which suggest psychogenic or hysterical causes. In adults, 15% of psuedohypacusis patients are malingerers, 30% have emotional disorders and 48% are unclassified. *See* www.ntuh.gov.tw/ENT/docLib3/psuedohypacusis

Landman's claim he'd developed chronic bronchitis while in the military. *Id.* Dr. Wilbur mentioned Dr. Weitzenkamp's claim of having treated Landman after Landman's discharge from the military, but no treatment records or documentation to support Dr. Weitzenkamp's statements were located. *Id.* Dr. Wilbur noted Landman's height as 5'10" and weight as 251 pounds. Dr. Wilbur's assessment was COPD, partially reversible with a bronchodilator. AR 168. Dr. Wilbur did not believe Landman suffered from emphysema. *Id.* Dr Wilbur also diagnosed moderate obesity. AR 169. Dr. Wilbur did not believe Landman suffered from chronic bronchitis. *Id.* In December, 1999, Landman received an award of service related disability benefits (30%) for COPD related to nicotine dependence. AR 268.

Landman reported to the Sioux Falls VA Hospital on August 30, 2000 (AR 164-165) for evaluation by Lalith Misra of Landman's claim, supported by a statement from Dr. Weitzenkamp (AR 184), that Landman suffered from sleep disorders and psychological problems that were caused by events which occurred while Landman was in the military. Misra disagreed with Dr. Weitzenkamp's assessment. AR 165. Misra noted that other evaluators who examined Landman during his incarceration found Landman to be pleasant and cooperative, with oriented and goal-directed thoughts. *Id.* No severe depressive symptoms were noted by them. *Id.*

Landman reported to the Sioux Falls VA Hospital on October 5, 2000 for an audiology assessment. AR 163. Landman believed he had a hearing loss in both ears. He reported constant tinnitus for the last twenty years. *Id.* He also claimed significant dizziness. The objective exam revealed borderline normal hearing in the low to middle frequencies sloping the mild high frequency hearing loss in the right ear. The left ear showed borderline normal hearing in the low to middle frequency range sloping to a mild hearing loss in the higher frequency range. AR 163. Speech determination ability was "excellent" bilaterally. The evaluator indicated Landman demonstrated poor test reliability. *Id.* No amplification aids were recommended. Annual monitoring was recommended. *Id.*

In May, 2002, Landman made claims for service related disability benefits regarding several alleged conditions. AR 244-261. The VA Administration continued his 30% service related

disability for COPD. AR 258. It denied his claims for nicotine dependence (AR 257), sleep disorder with resultant psychological and cognitive problems due to hearing loss and tinnitus (AR 256-257); sleep disorder/sleep apnea secondary to or aggravated by nicotine dependence (AR 255); obesity secondary to nicotine dependence (AR 254); skin condition due to mandatory immunizations (AR 253); neck condition (AR 252); Meniere's disease (AR 249-251);[7] coronary artery disease, peripheral vascular disease, and hypertension secondary to nicotine dependence (AR 248-249); emphysema (AR 247-248); post-traumatic stress disorder (PTSD) (AR 246-247); chronic bronchitis secondary to nicotine dependence (AR 245-246); and backache (AR 244-246).

### 3. Residual Functional Capacity Assessment (4/01) (Dr. John Hanson)

Dr. John Hanson completed a residual functional capacity assessment on April 12, 2001. AR 176-183. He assigned no exertional limitations (AR 177), no postural limitations (AR 178) no visual or manipulative limitations (AR 179) and no communicative or environmental limitations (AR 180). Dr. Hanson wrote about Landman: "exaggerated symptoms and non-physiologic results obscure the view of his actual status. Probably has some esophageal reflux and some element of reactive airways. Claimed symptoms and associated disability are not biologically plausible in severity, even if claimed diagnoses were better supported by the record. e.g. 'stop breathing' during exertion, with 'rescue inhaler.'" AR 181.

### 4. Residual Functional Capacity Assessment (DDS Physician 11/01)

A DDS Physician whose signature is not legible completed a Residual Capacity Assessment on November 20, 2001 (AR 236-243). The diagnoses listed were: COPD, Meniere's disease and acid-peptic disorder. AR 236. The physician assigned no exertional limitations, and no postural

---

[7]Although Landman told the prison PA that the VA diagnosed his Meniere's disease, the May 7, 2002 decision which denied VA benefits for Meniere's indicates their records show "there is no medical evidence showing when the Meniere's was diagnosed, treatment for the Meniere's (other than Antivert) and no medical evidence to establish the veteran's Meniere's is due to his period of military service." AR 250.

limitations except that Landman should never climb ropes, ladders or scaffolds.[8] He assigned no manipulative or visual limitations(AR 239) and no communicative limitations. AR 240. He instructed that Landman should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation and should avoid exposure to hazards such as machinery and heights because of his history of Meniere's disease. AR 240. The physician also noted that Landman's symptoms appeared to be disproportionate to his medically determinable impairments. AR 241. Although the DDS physician did not examine Landman, he based this finding on his review of Landman's medical records from the VA and the penitentiary. *Id.*

### 5.    Dr. Larry Weitzenkamp (6/98-10/01)

Dr. Larry Weitzenkamp provided several statements in support of Landman's efforts to obtain VA disability benefits. Although in one of his statements Dr. Weitzenkamp indicated he treated Landman from 1984 through 1991, he provided no medical records to support his statements. The various statements Dr. Weitzenkamp provided to the Veteran's Administration in support of Landman's VA disability claims are reproduced below:

> On June 25, 1998: I treated Mr. Landman and his family on numerous occasions when I was practicing medicine in Rapid City SD from July 1984 through April 1991. His residual records from that time are not available. I remember that he had a recurring problem with bronchitis related to his past history of smoking. (Illegible) remember with great concern (illegible) he was encouraged to smoke beginning in basic military training in the Air Force. He related that history to me more than once. He also had hearing loss continuing during the above time period with symptoms of constant tinnitus. He had learned to lip read fairly well when I was treating him but I cannot recall the decibel measurement of the hearing loss. It was affecting his (illegible) because of the constant tinnitus. His sleep was probably also disturbed because of his frequent bronchitis and beginning emphysema. I treated his sleep problem with sleep medication on occasion and encouraged him frequently to discontinue smoking to help reduce his frequent episodes of bronchitis and preserve his lung function. Other than his hearing loss, chronic bronchitis and early emphysema I am not aware of any other chronic health problems in this patient. AR 190.

> On August 29, 1999: In addition to my previous statement regarding Mr. Landman

---

[8]The doctor noted Landman should avoid heights because of dizziness even though his Meniere's disease was stable. AR 238.

I wish to confirm that he acquired a nicotine dependence from the use of tobacco products which occurred while he was in the military service and directly encouraged by supervisors during his military service between January 1976 and September 1983. His tobacco use and nicotine dependence were the direct cause of his chronic bronchitis and early emphysema for which I treated him at a later date. AR 189.

On May 12, 2000: This is to confirm that Mr. Landman had tinnitus and hearing loss when I first saw him after discharge from military service. These problems resulted in sleep disorder, related psychological and cognitive problems, and difficulty in studying. The hearing loss occurred prior to his first visit to my clinic during his time in the Air Force where his job requirements placed him on and very near active military runways. The above problems were caused by and exacerbated by his service exposure during active military duty. AR 186.

On August 1, 2001: Mr. Landman was recently diagnosed with Meniere's Syndrome as a result of suffering vertigo attacks with increasing frequency. Treated with 12 ½ mg. Meclizine 3 times daily, attacks occur 4 times weekly, I have previously stated that Mr. Landman was suffering from hearing loss, tinnitus and resultant sleeping disorders along with related cognitive and psychological problems; that this was likely caused or exacerbated by hazardous noise exposure while on active duty, less than one year after his separation, while noting his first symptoms, Meniere's Syndrome was not diagnosed. However, looking back, the pattern of symptoms might indicate that his Meniere's Syndrome began years previously; his service medical records show injuries received after being hit by an automobile accident in August of 1976, eye operations under general anesthesia in 1978 and 1979, hazardous noise exposure and documentation in June of 1982, a discharge physical revealed a hearing impairment in the higher frequency ranges and a report of severe headaches as well as a loss of memory for 5 hours with no diagnosis given in April of 1983. It is my opinion that it is much more likely than not that Mr. Landman's Meniere's Syndrome was caused or exacerbated by events which occurred in the military. AR 185.

On October 2, 2001: Mr. Landman is being treated for sleeping disorders along with related psychological and cognitive problems. These disorders, which now totally impair Mr. Landman socially and occupationally, have been treated since shortly (less than one year) after his discharge from active duty. Although not likely etiologically linked to his Meniere's Syndrome or respiratory problems, they do affect one another. His problems indicate post traumatic stress disorders with anxiety and cognitive dysfunction, becoming more acute upon recollections or dreams of disturbing situations that he experienced while in the military. Often stated were persistent fears of being killed or dying in a far-off land. Occurring daily, his anxiety disorders, generally accompanied with depression are likely linked to his sleeping problems. During these times Mr. Landman exhibits gross impairments of his cognitive processes often making him unable to rationally think or make decisions;

intermittent ability to attend to basic daily activities; time disorientation; grossly inappropriate (aberrant) behaviors. Mr. Landman's service medical records show: injuries received from a traffic accident in 1976; eye surgeries under general anesthesia in 1978 and 1979; a report of severe headaches and loss of memory with no diagnosis given. It is my opinion that Mr. Landman's sleeping disorders and psychological problems were caused by and/or exacerbated by events that took place while he was in the military. AR 184.

## 6. South Dakota Department of Corrections Health Services (6/97-1/02)
### A. Mental Health Treatment

Landman received an intake interview with a psychologist whose name is not legible. AR 735. The psychologist noted Landman was fully oriented and that his affect was appropriate. *Id.* He referred to Landman as a pedophile and a sexual deviant. *Id.* The psychologist identified Landman as likely to violate parole and likely to require mental health services and the STOP program. AR 736. He also identified Landman as likely to reoffend. *Id.* He indicated Landman "should not be permitted around children ever, including in the visitation rooms of this institution. Under no circumstances should he be allowed contact visits with his own children. He would be a poor risk for trusty status at any time, since he has the skill and expertise to escape and assume a new identity or to use his contacts with other pedophiles he has met through the internet to hide out. He should participate in the STOP program to address his sex offending issues, although the probability that he will benefit from treatment is not encouraging." AR 735.

Thereafter, on October 9, 1997, Landman had his initial session with Dr. Scott Pribyl. AR 734. Pribyl's notes are handwritten and many are illegible. Landman treated with Pribyl until Pribyl left the employ of SDSP in April, 1998. AR 729.

On April 21, 1998, Dr. John Lindquist saw Landman after Dr. Pribyl left SDSP's employ. AR 729. Landman was attentive and alert. His speech was stable and content appropriate. *Id.* Landman was "teary" when he discussed his family and his impending divorce. Lindquist observed no psychotic thought content or processes. Lindquist also observed Landman's above average intelligence and that he appeared motivated to work on his problems. *Id.*

10

On June 15, 1998 Pribyl sent a letter to Landman's lawyer on behalf of Landman explaining his treatment relationship with Landman. AR 703. Pribyl explained that Landman sought out counseling because he would not be eligible for the SDSP's Special Treatment of Perpetrators (STOP) sex offender treatment program for some period of time in the future. *Id.* Pribyl also noted Landman would have liked to receive counseling much more frequently but Pribyl's schedule within the prison did not allow it. *Id.* Pribyl indicated Landman appeared remorseful, intelligent, motivated, and "searching to truly understand the devastating effects of his choices to victimize others sexually." AR 704. Pribyl encouraged continued treatment after Landman's release. *Id.* Pribyl encouraged electronic monitoring, polygraph exams, and parole or probation to ensure community safety upon Landman's release. *Id.*

Landman reported to the mental health services department in October, 2001 indicating he was having problems with sleep, depression and anxiety. AR 722. He reported no motivation, low energy and poor memory and an increase in negative thoughts. *Id.* The therapist (Rick Inhofer) noted, however that Landman's thought process was intact and he had no suicidal ideation or intent. *Id.* Landman denied hallucinations. *Id.* His sleep was poor and his appetite was decreased. *Id.* When Landman returned at the end of the month, he'd decided to meet with his victim to discuss his crime. AR 722. He reported a decrease in his symptoms but was still having trouble sleeping. *Id.*

Landman saw Dr. Ulises Pesce (Psychiatrist) on January 31, 2002. AR 720. Landman reported difficulty sleeping and feeling anxious and depressed. He reported feeling down and having a hard time concentrating. Dr. Pesce observed no cognitive impairment and intact memory. *Id.* Dr. Pesce's impression was depression, NOS and anxiety, NOS. He prescribed Fluoxetine[9] and Elavil.[10]

---

[9]Fluoxetine is the generic name for Prozac. It is an antidepressant indicated for the acute and maintenance treatment of major depressive disorder in adult and certain pediatric patients. www.rxlist.com

[10]Elavil is otherwise known as amitriptyline. It is indicated for the relief of symptoms of depression. www.rxlist.com

## B.    General Health Care

Upon admission to the South Dakota State Penitentiary, Landman received a prescription for dandruff shampoo. AR 228. Landman reported to health services in July, 1997 with a sun rash. AR 227. Dr. Schaeffer prescribed hydrocortisone lotion. *Id.* Landman reported to health services on September 28, 1998 with a non-specific complaint of abdominal discomfort. AR 226. He did not relate the discomfort to food intake and did not report acute symptoms. *Id.* PA Zike instructed Landman to return to health services if he had an exacerbation of symptoms. *Id.*

On October 2, 1998 Landman reported to health services complaining of an "acute exacerbation" of abdominal discomfort. AR 225. He reported acid reflux and GI distress upon eating spicy foods or drinking milk. The physical findings were "minimal" other than tenderness of the abdomen. PA Zike decided to prescribe Tagamet[11] on a 30 day trial basis. *Id.*

On November 13, 1998 Landman visited health services complaining of stomach pain. AR 224. Exam revealed obesity and tenderness in the upper left quadrant. *Id.* Dr. Regier diagnosed possible acid peptic disease. He again prescribed Tagamet for one month. *Id.* Landman visited health services on November 30, 1998 requesting a refill of his dandruff shampoo. AR 223. No other problems were noted. *Id.*

On December 16, 1998, PA Zike initiated a chronic care program for Landman's acid peptic disorder. AR 222. Zike also ordered a metabolic panel and started Landman on Tagamet twice a day.

Landman saw PA Zike on January 15, 1999. AR 221. He reported losing a little weight and feeling better. *Id.* He indicated he'd been working out and watching what he ate. PA Zike renewed Landman's Tagamet. *Id.*

Landman reported to PA Zike in April, 1999. AR 220. He inquired about the effect of Coke

---

[11]Tagament is a histamine H-2 receptor antagonist. It is indicated for the treatment of erosive gastroesophageal reflux disease (GERD). www.rxlist.com

on his acid peptic condition. Zike recommended that Landman decrease the amount of Coke (approximately 20 glasses per day) Landman was currently consuming to improve his condition. *Id.*

In July, 1999 Landman reported getting along fairly well with his chronic peptic disorder by taking his Tagamet. AR 219. He indicated as long as he took his medication, he was "in good shape." He reported "no other problems." *Id.*

On October 13, 1999 Landman reported to PA Zike that his acid peptic disorder was doing "real well." AR 218. He was not as dependent on the Tagamet. Landman attributed the improvement to his involvement in a "small group" which allowed him to release stress. *Id.*

Landman reported to health services on January 12, 2000 for a chronic care check up for acid peptic disorder. AR 217. Landman reported doing well and not requiring Tagamet as often and only occasional reflux problems. PA Zike decreased Landman's Tagamet prescription. *Id.*

PA Zike saw Landman on January 24, 2000 when Landman was coughing excessively. AR 216. Zike initially believed Landman had chronic allergies but decided to put Landman on chronic care for COPD. *Id.* He also ordered a chest x-ray to rule out emphysema. *Id.*

Landman reported to PA Zike for a chronic care checkup on April 12, 2000. AR 215. He was doing fairly well and reported no acute problems. Zike reduced Landman's Chlor-Trimeton medication and renewed his other medications. *Id.*

Landman reported to PA Zike on June 12, 2000 for an annual physical. AR 214. Landman denied any acute problems. He reported a longstanding history of sleep apnea and bilateral hearing problems. He also reported a history of tinnitus, GI distress and low back pain. Zike observed Landman's "obvious obesity." *Id.*

Landman saw PA Zike on July 12, 2000 for medication refills. AR 213. He reported

13

"getting along pretty good." Landman indicated he used Chlor-Trimeton as a sleep aid to help with his sleep apnea. PA Zike did not believe the use of Chlor-Trimeton as a sleep aid made much sense, but he renewed the medication nevertheless. *Id.*

Landman saw PA Zike on October 11, 2000. AR 212. He denied any acute problems and reported he was "getting along very well." His mental status was "oriented times three." Zike renewed Landman's prescriptions.

Landman reported to PA Zike on November 29, 2000. He indicated he'd been seen at the Sioux Falls VA Medical Center where he was diagnosed with Meniere's disease.[12] AR 211.[13] Landman reported hearing loss and episodes of tinnitus and vertigo. He reported to Zike, however that "he does not hear the tinnitus at all any longer." *Id.* Zike prescribed Antivert for the Meniere's disease. *Id.*

Landman reported to Health Services on December 20, 2000 for medication refills. He had a skin rash for which PA Zike prescribed hydrocortisone cream. AR 210. Landman reported he was "real pleased" with the results of the Antivert and reported it worked well for his Meniere's disease. Landman indicated he did not need the Antivert all the time "but when he needs it, he needs it." *Id.*

Physician's Assistant Zike saw Landman on January 1, 2001 for a chronic care checkup for reactive airway disease and acid peptic disorder. AR 209. Landman reported doing well and denied any problems. He indicated he was only using his inhaler on an "as needed" basis. Zike observed no wheezing and did not believe a chest x-ray was necessary. *Id.* Landman's medications (Tagamet, albuterol inhaler, Chlor-Trimeton and Antivert) were all renewed.

---

[12]Meniere's disease is a disorder of the inner ear that causes spontaneous episodes of vertigo –a sensation of a spinning motion–along with fluctuating hearing loss, ringing in the ear (tinnitus) and sometimes a feeling of fullness or pressure in the ear. http://www.mayoclinic.com/health/menieres-disease/DS00535

[13]In May, 2002, however, the Veteran's Administration indicated it could find no record of when Landman's Meniere's disease was diagnosed. AR 250.

Landman reported to health services on February 8, 2001 with right ankle and left wrist pain after a slip and fall. AR 208. Exam revealed no bruising or swelling and full range of motion in the left wrist and right ankle. PA Schild prescribed an Ace wrap and Tylenol. *Id.*

PA Schild saw Landman on April 10, 2001 for a chronic care check on his COPD and acid peptic disorder. AR 207. Landman asked for Schild's opinion regarding Meniere's disease but Schild declined because Schild was not familiar with Landman's history. *Id.* Schild observed no signs of vertigo and the remainder of the exam was unremarkable.

PA Schild saw Landman on June 6, 2001 regarding Landman's complaint of dyspepsia (indigestion). Schild recommended that Landman avoid being sedentary immediately after eating and to avoid purchasing spicy food from the commissary. AR 206.

PA Schild saw Landman on July 10, 2001 for a chronic care check on his COPD, acid peptic disorder and a prescription renewal for Antivert. AR 204. Landman reported things were going "fairly nicely" but he still had occasional bouts of vertigo. Schild decided to increase Landman's Antivert dose. *Id.*

PA Schild saw Landman on October 10, 2001 for a chronic care check on his COPD and acid peptic disorder AR 193. Landman reported things were going "very nicely." He reported his Meniere's disease was "pretty stable." *Id.* He agreed to an increase in his Antivert. Schild noted Landman's peak flows had "improved nicely" from the previous measurement. He noted no evidence of vertigo. Landman ambulated well with a normal gait. Schild continued Landman on his medications of Antivert, an albuterol inhaler, Zantac, and Chlor-Trimeton.

### 7.    Dr. Michael McGrath (1/20/04)

Dr. McGrath performed a psychological evaluation on January 20, 2004 to determine

15

Landman's eligibility for VA disability benefits. AR 682-691.[14]

Dr. McGrath was asked to evaluate Landman for a "mental disorder." AR 682. Dr. McGrath examined Landman and reviewed his past medical records, administered the MMPI-II and the DAPS (Detailed Assessment of Post-Traumatic Stress Disorder) tests. *Id.* Dr. McGrath noted Landman's thought processes were logical and easily followed and that his affect was flexible and appropriate. His mood was within normal limits. AR 682-83. Dr. McGrath noted Landman's various claims for service related disability, all of which had been denied except 0% for nicotine dependence and 30% for COPD. Dr. McGrath referred to Landman's service related disability claims as the "shotgun approach." AR 683.

Dr. McGrath interviewed Landman extensively. AR 684-690. Based on his interview with Landman, his review of the records and the testing conducted by him, Dr. McGrath made the following findings:

> As noted, the patient claimed the stressor contributing to his current application related to the T-38 crash. He identifies on the DAPS two stressors. The first stressor has to do with a motor vehicle accident in 1976 where he claims to have lost consciousness 'and was hurt and grateful he didn't die.' He also feels another significant stressor was being fired upon when he was transporting nitrogen cylinders in the Phillippines. In terms of the DAPS, he produced an invalid profile. This is due to the over-endorsement of items indicative of psychopathology. In short, it appears that he was trying to exaggerate symptoms. Likely this represents malingering of symptoms. Because of the invalid approach to that testing, no inference concerning PTSD can be drawn. His inconsistency in identifying what the stressors are suggest that likely he does not suffer from this disorder. In addition, it is clear that he wants to identify a variety of things as potential stressors which would meet the DSM-IV criteria.
>
> Though he tended to endorse an excessive number of items of psychology on the early portions of MMPI-II, he produced more valid psychology on the latter portions of that testing. The clinical profile suggest an individual who may be experiencing heightened feelings of depression and anxiety. Most noteworthy in terms of that

<hr />

[14]The examination occurred outside the relevant time frame, but it is included in this summary because Dr. McGrath's conclusions provided the basis for Judge Schreier's reversal and remand in 2005.

protocol is very marked emphasis upon somatic complaints. Though there may be a physiological basis to some of these complaints, testing strongly suggests functional component to many of them. These complaints may be hypochondrial in nature or at least have some functional/psychological component to them.

He also obtained an elevated McAndrew alcoholism scale score. This suggests an enhanced probability of a history and/or presence of alcohol or other substance abuse.

At present, he may feel largely overwhelmed by various difficulties confronting him. He does experience some heightened anxiety, tension and depression, despite the use of antidepressant medication.

DIAGNOSTIC IMPRESSION:
AXIS I:       Pedophilia, somatoform disorder, NOS, vs. hypochondriasis.
AXIS II:      No disorder
AXIS III:     Deferred to Dr. Sobczyk's evaluation
AXIS IV:      Psychosocial and environmental stressors = current incarceration for
              potentially extended period; likely a dearth of family support.
AXIS V:       GAF=55

CONCLUSIONS: It does not appear that the patient suffers from PTSD, though it also is not clear that, at least in terms of the formal application, that he was applying for the disorder. It is not clear that any military experiences contributed to the current psychological difficulties, the most important of which is his pedophilia.

## B.     Third Party Statements
Landman submitted several third party statements in support of his claim:

### 1.     Peggy Stammer, STOP therapist (7/19/01)

Ms. Stammer submitted a statement confirming that Landman successfully completed all four steps of the STOP program as of January 3, 2001. As of the date of her memo, he continued to voluntarily participate in step five (relapse prevention). AR 667.

### 2.     Dean Frey (8/19/02)

Mr. Frey was a fellow inmate at the MDSP and was Landman's roommate. AR 668. Frey described Landman as forgetful and as having panic attacks. He indicated Landman as having bad dreams and talking in his sleep. He also claimed Landman had trouble breathing and hearing. Frey also described Landman as having trouble with his balance because of vertigo. Frey described

17

Landman as "depressed often." *Id.*

### 3.    David Raba (8/20/02)

Mr. Raba was likewise a fellow inmate and roommate at MDSP. AR 669. Raba indicated Landman got confused easily. He explained Landman ran out of breath easily and always had his "puffers" with him. He thought Landman was depressed a lot and hard to converse with because of his hearing problems. Landman got frustrated when he got dizzy and sometimes fell when he could not catch himself. Sometimes he had anxiety attacks. *Id.*

### 4.    Ron Nielson (8/21/02)

Mr. Nielson was another fellow inmate and roommate at MDSP. AR 670. Nielson indicated he'd known Landman since Landman's arrival in prison. He claimed Landman's ability to speak and hear deteriorated over the years. Nielson observed Landman had been having dizzy spells only a few times a week but now he was having them daily. Landman's sense of humor disappeared. Nielson also observed that Landman often asked people to repeat themselves. *Id.*

### C.    Hearing Testimony

Landman's final administrative hearing was held on September 25, 2009. AR 814-905. Landman, Dr. Kevin Schumacher, and vocational expert Thomas Audet testified. The Administrative Law Judge was in Fargo, North Dakota. Dr. Schumacher testified from Fargo. Landman's counsel was in a hearing room in Sioux Falls, South Dakota, as was the vocational expert. Landman testified via telephone from the MDSP in Springfield, South Dakota.

Landman was born in 1957 and was fifty-two years old at the time of the hearing. He had been incarcerated since 1997. He had been divorced since 1999 and had seven children between his two marriages. His youngest child turned eighteen in 2007. AR 825.

The ALJ asked Landman to direct his testimony to his condition as of the date of his last insured. Landman indicated he used albuterol (an emergency inhaler), Flowmax for his COPD,

18

and a cane to assist him with the vertigo caused by his Meniere's disease. AR 826. Landman explained the cane was prescribed and he used it three or four times a week. *Id.*

He believed that in 2001 he had difficulty concentrating for longer than approximately fifteen minutes. AR 827-28. He had trouble organizing his thoughts. AR 828. He could do simple math but not dynamic problem solving. He could not manage money because he ended up going bankrupt in 2005. AR 828-29.

Landman was in the Air Force from 1976 until he was discharged in 1983. AR 829. Landman applied for disability benefits through the Veteran's Administration several times, and was finally awarded partial disability based on his COPD in 2000. AR 830. He was also allowed a premium waiver on his VA life insurance policy in 2000, based on a determination that he was totally disabled. *Id.*

Landman believed his most severe physical problems on or before December 31, 2001 were COPD and Meniere's disease. AR 836. His COPD made it hard for him to breathe and made him tired all the time. *Id.* His symptoms improved ten or fifteen percent with albuterol. He can catch his breath but he can't concentrate when he uses it. AR 838-39. His COPD affected his ability to walk and got worse when the weather was cold or humid. *Id.*

Landman attributed tinnitus, hearing loss and vertigo to his Meniere's disease. *Id.* The VA told him he needs hearing aids but because he's in prison the state must pay for them. AR 841. He can't get hearing aids, however, because the State can't afford them. AR 841-42. He's had tinnitus since he was released from the military. AR 842. It's gotten worse over the years and eventually become constant. *Id.* His vertigo began in the late 1990's. AR 843. In the late 1990's he started having vertigo spells at least three or four times a week. *Id.* He learned to reduce his Antivert dosage by relying on his inner confidence. *Id.* The DOC health services put him on Antivert in 2000, but he continues to have vertigo attacks three or four times a week. AR 844. The attacks last for a few hours but he only needs to sit down for fifteen minutes to compose himself. *Id.*

19

As of his date-last-insured Landman also suffered from upper and lower back, joint and neck pain. AR 846. Sometimes the pain lasted for days. He was prescribed Naproxifan and Naproxen. *Id.* He rated his back pain at eight or nine (AR 849) and his left shoulder pain at seven. AR 850.

Landman attributed "peptic ulcer" to anxiety. AR 850. He claimed the prison physicians prescribed Haldol[15] for his ulcer. Before he was in prison he used baking soda. *Id.*

Landman testified he had PTSD. AR 851. He "absolutely" thought he had anxiety, depressive panic attacks and insomnia as of his date last insured. AR 852. The symptoms he attributed to PTSD are that he became easily excited, upset, worried and panicked. He had panic attacks at least two or three times a week. *Id.* They came in waves and lasted an hour or longer. AR 853. He got the attacks if he perceived people were thinking badly of him. When he started talking to Dr. Pribyl the severity of the attacks decreased. *Id.* He did not start taking any medication until 2002. Until then, he used therapy with Dr. Pribyl, anxiety logs and STOP therapy. *Id.* Those therapies did not help him, however when he woke up in cold sweats or when he had to deal with people on a social level. AR 854.

Landman was depressed before 2001. He just wanted to give up. When he finally decided he could not work any more he was just at the end of his rope. AR 854. He had family problems because his wife left him when she found out about his pedophilia. *Id.* He had trouble sleeping and he over ate. In prison, however, he could not show weakness. AR 855. Dr. Weitzenkamp prescribed Halcion[16] for Landman's depression because he was having trouble sleeping and coping. AR 856.

Landman was diagnosed with pedophilia and sexual deviation upon his intake interview in prison. AR 856. He began group therapy in prison in 1999. *Id.* His therapy continued until 2005.

---

[15]Haldol is an antipsychotic indicated for use in the treatment of schizophrenia. www.rxlist.com

[16]Halcion is indicated for the short-term treatment of insomnia. www.rxlist.com

20

AR 286-287. At that time the programming at the prison changed. Now he is in a different type of therapy program which began in 2007. AR 857. Landman believed he received "only marginal" benefit from therapy before 2001. *Id.* He was uptight, paranoid and excitable until he got on medication in 2002. AR 857-58.

Before he went to prison in 1997 Landman had few friends. AR 858. He lived with his brother. He did not believe he got along well with his supervisors when he worked at the movie theater. AR 859-60. He walked away from confrontations. AR 860. He had problems concentrating. *Id.* He had a hard time sitting down to read a book and sometimes could not even decide what to order at a restaurant. AR 861. He had a hard time watching an entire movie. *Id.* Sometimes his brother or prison roommate had to help him get dressed. AR 862. He did have part-time jobs in prison. AR 863. Dr. Weitzenkamp started treating him for depression and smoking in 1986 or 1987. AR 874. Dr. Weitzenkamp opined Landman's PTSD and aberrant behavior began at an earlier time, in the 1980's or 1990's. *Id.*

Before his date last insured, Landman estimated he could lift between twenty and twenty-five pounds occasionally and "a few" pounds frequently. AR 864. He could walk about a quarter of a mile, but sometimes only about a hundred feet. *Id.* He had three bad days a week when he was just tired all the time. AR 865. On a good day he could stand or sit for fifteen minutes at a time. He could climb a flight of stairs. He could manipulate buttons and zippers most of the time. AR 866.

Dr. Kevin Schumacher also testified at the administrative hearing. AR 877. Dr. Schumacher did not examine Landman but reviewed the medical evidence in the file. AR 877-78.[17] He opined about Landman's disability status between the date of his alleged onset and his date-last-insured (June 19, 1996 through December 31, 2001). AR 878. Dr. Schumacher testified that during the relevant time frame, the only mental impairment demonstrated by medical signs and findings in the records was pedophilia, but pedophilia is not a "listed" impairment. AR 879. Schumacher indicated

_____

[17]On cross-examination by Landman's attorney, Schumacher explained his opinion did not change after listening to Landman's hearing testimony. AR 882.

the records did not reveal diagnoses for depression or PTSD during the relevant time frame. AR 879. Schumacher did not believe Landman demonstrated a personality disorder as of the date last insured. AR 886-887. Schumacher evaluated Landman's limitations using the "B" criteria[18] based on pedophilia alone. AR 880. He identified no restrictions on activities of daily living, marked restrictions on maintaining social functioning, no difficulties on maintaining concentration, persistence or pace, and no episodes of decompensation. AR 880. Dr. Schumacher assigned no restrictions in the ability to understand, remember, and carry out simple instructions. AR 881. He assigned no restrictions on the ability to make judgments on simple work-related decisions. *Id.* He assigned no restrictions on the ability to interact appropriately with the public, with the exception that Landman would be prohibited from working with children. *Id.* He assigned no restrictions on Landman's ability to interact with supervisors or co-workers or to respond appropriately to normal work pressures or changes. *Id.*

Vocational expert (VE) Tom Audet testified at the administrative hearing. AR 891. The ALJ asked Mr. Audet to assume an individual of Landman's age, educational background and past relevant work. AR 893. The ALJ's first hypothetical further asked the VE to assume the person was limited to light work with only occasional push/pull on both the upper and lower extremities. AR 893-94. He further asked the VE to assume an occasional limitation on climbing stairs and ramps, balancing, stooping, kneeling, crouching and crawling and that the person could never climb ladders, ropes and scaffolds or and work at heights. The VE was also asked to assume the person should avoid loud background noises and concentrated exposure to humidity, wetness, dust, odors, fumes, and extreme temperatures. AR 894. The job should require only the ability to understand, remember and carry out short, simple instructions and interact appropriately with supervisors and co-workers on a brief and superficial basis and avoid contact with the general public. The person would be able

---

[18]"The listing for each mental disorder . . .consists of two parts, a set of clinical findings (paragraph A criteria) and a set of functional restrictions (paragraph B criteria). 20 C.F.R. pt. 404, subst. P, app.1 pt. A, § 12.00(A), at 376. A claimant who meets one or more of the clinical findings criteria and two or three of the functional restrictions criteria is presumed to be disabled by the mental disorder in question. *See id.*" *Pratt v. Sullivan*, 956 F.2d 830, 834, n. 7 (8th Cir. 1992).

22

to respond to appropriate changes in the routine work setting and make judgments about simple work-related decisions. AR 895. The ALJ assumed Landman's past relevant work was precluded. *Id.* Given that hypothetical, the VE opined there would be other jobs that such an individual would be able to perform, such as small products assembler (DOT Code 739.687-030, light duty, unskilled); inspector packager (DOT Code 559.687-074, light duty, unskilled); and production assembler (DOT Code 706.687-010, light duty, unskilled). Audet indicated his testimony was consistent with the Dictionary of Occupational Titles. AR 896.

When the ALJ changed his hypothetical to limit the person to sedentary work with a restriction of standing/walking for only two hours per day, the VE identified two more potential jobs: Jewelry preparer (DOT Code 700.687-062 sedentary, unskilled); and circuit board assembler (DOT Code 726.684-010, sedentary, unskilled). Again, the VE indicated his testimony was consistent with the Dictionary of Occupational Titles. AR 898. Upon cross-examination by counsel, the VE indicated that if Landman needed to move around every 15 minutes and needed to lie down every hour, he would not be able to perform the jobs mentioned. AR 899.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) . Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf,* 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial

evidence would have supported an opposite decision. *Id.* If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. *Smith*, 982 F.2d at 311.

## B. The Disability Determination and The Five Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ applies a five step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. *Bartlett v. Heckler*, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

**Step One:** Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of

impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell*, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

### C. Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but

instead, originates from judicial practices." *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

### D.    The ALJ's Decision

The ALJ issued a twenty-one page, single-spaced decision on October 28, 2009. AR 484-504. The ALJ's decision discussed steps One through Five of the above Five-step procedure. The ALJ determined that Landman last met the insured status requirements of the Social Security Act on December 31, 2001. AR 488. At step One, the ALJ determined Landman did not engage in substantial gainful activity at any time beginning on his date of alleged onset through his date last insured. *Id.*

At step Two, the ALJ determined that through his date last insured, Landman's severe impairments consisted of: chronic obstructive pulmonary disease, obesity, hearing loss with tinnitus, Meniere's disease, and pedophilia. AR 488. The ALJ specifically determined that Landman's alleged impairments of depression, anxiety, PTSD and somatoform disorder were not medically determinable during the relevant time period. AR 489-90. In making that finding, the ALJ gave "great weight" to the opinion of Dr. Kevin Schumacher. *Id.* The ALJ stressed that he gave great weight to Schumacher's opinion because "of his opportunity to review and consider the Claimant's longitudinal and medical history, and the consistency of his opinion with the relevant medical evidence of record generated during the period at issue, and the record as a whole." AR 490. Regarding Landman's alleged somatoform disorder, the ALJ further explained:

> The undersigned does not find medical evidence of record to support the conclusion that the claimant's somatoform disorder was medically determinable prior to December 31, 2001. The record shows that a psychologist interviewed the claimant on June 25, 1997, and did not note any complaints of symptoms or physical ailments related to somatoform disorder, or suggest a tentative diagnosis of somatoform disorder. There is no indication in mental health progress notes from 2001 that the claimant had complained of symptoms that could have been reasonably related to his somatoform disorder, or that an acceptable medical source diagnosed the claimant with somatoform disorder. In fact, medical records do not show any persistent complaints by the claimant to treatment providers of physical pain or ailments during the relevant period.

AR 491.

The ALJ noted pedophilia is not a personality disorder which is recognized by the Social Security Administration under the "Listed" mental disorders. AR 492. He acknowledged Dr. Schumacher's opinion that no medical evidence in the record supported a finding that Landman had a personality disorder. AR 492. Finally, the ALJ acknowledged Landman's peptic disorder but found it was not severe. *Id.*

At step Three, the ALJ determined that Landman did not have an impairment or combination of impairments that met or equaled a listing. AR 493. The ALJ considered Listing numbers 2.0 (Special senses and speech–hearing loss) and 3.0 (Respiratory system). The ALJ also indicated that he considered Landman's obesity when determining the extent of Landman's impairments. AR 493. Although pedophilia is not a listed mental impairment, the ALJ considered whether pedophilia "met or medically equaled the criteria of any listed impairment during the relevant period under the "B" criteria . . ." AR 493.

At step Four, the ALJ determined Landman retained the residual functional capacity to perform less than the full range of light work as follows: he could lift/carry twenty pounds occasionally, ten pounds frequently. AR 495. He could sit six hours out of an eight hour work day, and stand/walk six hours out of an eight hour work day. He could push/pull occasionally and climb ramps and stairs occasionally. He could never climb ladders, ropes or scaffolds. He could never balance, stoop, kneel, crouch or crawl. He should avoid concentrated exposure to humidity and wetness, extreme temperatures and irritants such as dust, fumes, odors and other pulmonary irritants. He should never work at unprotected heights or around moving mechanical parts. *Id.* He should avoid loud background noise. He was limited to understanding, remembering and carrying out short, simple instructions and interacting appropriately with supervisors and co-workers on a brief and superficial basis, but never with the general public in a work setting as doing so would expose him to children. He could respond appropriately to changes in a routine work setting and make judgments on simple work-related decisions. AR 498. This residual functional capacity did not

27

allow Landman to return to his past relevant work. AR 502.

At step Five, the ALJ determined that although Landman is not capable of his past relevant work, there exist other jobs in the national economy which Landman can perform. As such, the ALJ determined Landman is not disabled. AR 503.

### E.    The Parties' Positions

Landman asserts the Commissioner erred in three ways: (1) The Commissioner failed to give weight to Dr. Weitzenkamp's medical statements; (2) The Commissioner failed to properly evaluate Landman's somatoform disorder; and (3) the Commissioner's determination that Landman could engage in other substantial gainful activity is unsupported by substantial evidence. The Commissioner asserts her decision is supported by substantial evidence on the record and should be affirmed.

### F.    Analysis

Landman asserts the ALJ made three mistakes: (1) rejecting Dr. Weitzenkamp's opinion; (2) improperly evaluating Landman's alleged somatoform disorder; and (3) improperly determining Landman is capable of other substantial gainful work. These assertions are examined in turn.

#### 1.    Dr. Weitzenkamp's Opinion

The ALJ considered but gave no weight to Dr. Weitzenkamp's statement dated October 2, 2001. AR 491. In that statement, Dr. Weitzenkamp opined that Landman suffers from disabling post-traumatic stress disorder, anxiety and depression and that the genesis of all of these conditions is Landman's military service. AR 184. This claim is easily dispatched.

In her decision reversing and remanding the previous administrative ruling, Judge Schreier addressed the sufficiency of Dr. Weitzenkamp's opinion. Dr. Weitzenkamp opined Landman is totally disabled by PTSD, anxiety and depression. Judge Schreier stated:

> The Court finds that the ALJ sufficiently fulfilled his duty to adequately develop the
> record because there was substantial evidence in the record from which the ALJ could

determine that depression, anxiety and PTSD did not qualify as severe impairments before December 31, 2001, when Landman's insured status expired. . . . As noted above, Landman did not include mental limitations in his initial request for disability benefits. Nor did Landman seek treatment for anxiety, depression or PTSD while he was enlisted in the Air Force. In fact, the VA noted that Landman's military medical records contained no evidence that he ever complained of or sought treatment for PTSD or depression. . Following discharge from the Air Force, Landman worked until June of 1996, and there is nothing indicating that his mental health limited his ability to work. Further, none of Landman's medical records from the time of his discharge from the Air Force and his incarceration in July of 1997 indicate that Landman sought treatment for anxiety, depression, or PTSD. Nor did the medical records from the time Landman was incarcerated until at least December 31, 2001, when his insured status expired. Finally, the VA's psychological evaluation, which was performed on January 20, 2004, indicated that Landman was not suffering from PTSD, and that he was exaggerating his symptoms. AR 417.

The only evidence that indicated Landman suffered from anxiety, depression, or PTSD is Dr. Weitzenkamp's statement. Although Dr. Weitzenkamp, who apparently treated Landman before he was incarcerated, indicated that Landman was suffering from sleep disorders and PTSD, the ALJ gave no weight to Dr. Weitzenkamp's statement. Landman does not contest this determination, and thus, the Court also disregards Dr. Weitzenkamp's statement.

In short, the Court finds there is virtually no evidence indicating that Landman was suffering from anxiety, depression or PTSD, or that these conditions significantly limited Landman's ability to perform basic work activities. Thus, the record contained substantial evidence from which the ALJ could conclude that Landman's anxiety, depression, and PTSD did not qualify as severe impairments. *See* 20 C.F.R. 404.1520(c). Accordingly, the ALJ complied with his duty to fully and fairly develop the record regarding Landman's mental impairments, and the ALJ did not err in refusing to order a psychological consultative evaluation. . . .

*Landman v. Barnhart*, Civ. 05-4134 (United States District Court, District of South Dakota) Doc. 38, p. 13-14.

In her Opinion, Judge Schreier made findings of fact which became the law of the case. "The law of the case doctrine prevents the relitigation of a settled issue in a case and requires courts to adhere to decisions made in earlier proceedings. The 'law of the case' doctrine also applies to administrative agencies on remand." *Brachtel v. Apfel*, 132 F.3d 417, 419 (8th Cir. 1997) (citations omitted).

Judge Schreier (1) disregarded Dr. Weitzenkamp's opinion; (2) found there was virtually no evidence indicating Landman was suffering from anxiety, depression or PTSD, or that those conditions significantly limited Landman's ability to perform basic work activities; and (3) found the record contained substantial evidence from which the ALJ could conclude Landman's anxiety, depression, and PTSD did not qualify as severe impairments. Landman cannot relitigate issues settled by Judge Schreier's earlier decision. *Brachtel* at 419.

### 2. Somatoform Disorder

Landman asserts the ALJ failed to properly evaluate his somatoform disorder. A somatoform disorder is defined in the "Listings"( 20 C.F.R. App. 1 to Subst. P of Part 404) as follows:

§ 12.07 Somatoform Disorders: Physical Symptoms for which there are no demonstrable organic findings or known physiological mechanisms.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A.   Medically documented by evidence of one of the following:
1.   A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or
2.   Persistent nonorganic disturbance of one of the following:
    a.   Vision; or
    b.   Speech; or
    c.   Hearing; or
    d.   Use of a limb; or
    e.   Movement and its control (e.g. coordination disturbance, psychogenic seizures, akinesia, dykinesia; or
    f.   Sensation (e.g. diminished or heightened).
3.   Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

AND
B.   Resulting in at least two of the following:
1.   Marked restriction of activities of daily living; or
2.   Marked difficulties in maintaining social functioning; or
3.   Marked difficulties in maintaining concentration, persistence or pace; or
4.   Repeated episodes of decompensation, each of extended duration.

ALJ Olson found:

The undersigned finds that the claimant's mental impairments of depression, anxiety, posttraumatic stress disorder, and somatoform disorder were not medically determinable impairments during the relevant time period from June 16, 1996 through December 31, 2001.
***
The undersigned does not find medical evidence to support the conclusion that the claimant's somatoform disorder was medically determinable prior to December 31, 2001. The record shows that a psychologist interviewed the claimant on June 25, 1997, and did not note any complaints of symptoms or physical ailments related to somatoform disorder, or suggest a tentative diagnosis of somatoform disorder . . . There is no indication in mental health progress notes from 2001 that the claimant had complained of symptoms that could have been reasonably related to his somatoform disorder, or that an acceptable medical source diagnosed the claimant with somatoform disorder. . . .In fact, medical records do not show any persistent complaints by the claimant to treatment providers of physical pain or ailments during the relevant period.

AR 490-91.

A somatoform disorder "causes [claimants] to believe that [their] physical ailments are more serious than the clinical data would suggest." *Easter v. Bowen*, 867 F.2d 1129 (8th Cir. 1989). "In cases involving somatoform disorders, an ALJ may not dismiss a claimant's subjective experiences without an express finding on the record that his testimony is not credible." *Jones v. Callahan*, 122 F.3d 1148, 1152 (8th Cir. 1997).

In her Opinion, Judge Schreier remanded this case for reconsideration of "the impact" of Dr. McGrath's 2004 somatoform disorder diagnosis upon Landman's credibility.[19] Thereafter, Dr.

_____

[19]In his brief, Landman asserts Judge Schreier "found that evidence from Dr. McGrath's diagnosis met the requirements of a medically determinable impairment." Doc. 16 at p. 22. This is incorrect. Judge Schreier stated: "the ALJ erred in discrediting Landman's subjective complaints. As indicated, Landman has been diagnosed with a somatoform disorder, and thus, the court would expect his subjective complaints to appear exaggerated and unsupported by the medical evidence. . . . The ALJ could only disregard Landman's subjective complaints if the ALJ explicitly found that Landman's testimony was not credible. . . .Landman did not testify, however, because he waived the evidentiary hearing. Thus, the ALJ needs to consider the impact of Landman's somatoform disorder in determining the weight attributable to Landman's subjective complaints, and the court remands the case to enable this analysis."

Judge Schreier acknowledged that Dr. McGrath diagnosed Landman with somatoform

McGrath testified in a second administrative hearing (held on January 22, 2008) Landman did not have somatoform disorder before his date last insured. AR 798. McGrath explained that as of his date last insured, Landman's only psychiatric diagnosis was pedophilia. AR 796. Dr. McGrath's testimony, however, was subsequently disregarded by the Social Security Administration because McGrath previously evaluated Landman for Veteran's benefits and was therefore arguably not an impartial medical expert. AR 531-33.

The third administrative hearing was conducted by a different ALJ. A different medical expert (Schumacher) testified. Schumacher also opined that as of Landman's date last insured, his only mental impairment was pedophilia. AR 879.

While the opinion of a non-examining consulting physician *standing alone* does not constitute substantial evidence, when the ALJ relies on the opinion as one part of the record which as a whole supports his findings, it is sufficient. *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004). *See also, Anderson v. Barnhart*, 344 F.3d 809, 812-13 (8th Cir. 2003) (generally consulting physician opinion does not constitute substantial evidence but there are two exceptions: (1) where the

---

disorder in 2004. She recognized somatoform disorder would cause Landman's subjective complaints about other conditions to appear exaggerated and unsupported by the medical evidence. She remanded the case with instructions for the ALJ to "consider the impact of Landman's somatoform disorder in determining the weight attributable to Landman's subjective complaints."

Unlike her specific factual findings regarding PTSD, anxiety and depression, however, Judge Schreier made no specific factual findings about whether Landman had somatoform disorder as of his date last insured in 2001. Likewise, she did not comment upon the weight of the record evidence regarding Landman's subjective complaints about his physical conditions or whether it supported a finding that he suffered from somatoform disorder as of his date last insured. Instead, she remanded the case with instructions for the ALJ to make those determinations.

Landman now argues in both briefs that in the last hearing ALJ Olson refused to allow Landman to testify about his somatoform disorder at the hearing. That is not correct. Landman brought up the disorder at the end of the hearing but neither he nor his lawyer asked that he testify on that issue. AR 901-03.

consulting assessment is supported by better or more thorough medical evidence; (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions). "[T]he burden of proof is on the claimant to show the existence of a disability on or before the date that the insurance coverage expires." *Basinger v. Heckler*, 725 F.2d 1166, 1168 (8th Cir. 1984). Landman offers Dr. Weitzenkamp's statement in support of his assertion that somatoform disorder was present on or before his date last insured. Landman may not rely on Dr. Weitzenkamp's statement, however, because it was rejected by Judge Schreier in her 2006 Opinion.

The ALJ turned to other record evidence to determine whether Landman suffered from somatoform disorder on or before December 31, 2001. The ALJ noted that (1) none of the health care providers who actually provided either mental or physical care to Landman during the relevant time frame diagnosed Landman with somatoform disorder on or before December 31, 2001; and (2) neither the mental nor physical health care records during the relevant time period indicate that Landman was exhibiting symptoms of somatoform disorder during the relevant time frame. AR 491. The Court agrees.

The prison psychiatrist noted no signs of somatoform disorder on Landman's intake interview in June, 1997. The intake evaluation is found at AR 735-737. During that interview, Landman was fully oriented and his mood, affect and behavior were all appropriate. AR 737. He'd had no mental health treatment in the last five years. AR 736. The psychologist diagnosed Landman as a pedophile and sexual deviant but did not mention any other mental disorders. *Id.*

Landman consistently treated with mental health providers during his incarceration. The ALJ correctly noted that none of Landman's mental health records show a diagnosis of somatoform disorder on or before Landman's date last insured. Dr. Pesce's impression in January, 2002, was depression, NOS, and anxiety, NOS. AR 720. Dr. Pesce did not diagnose Landman with somatoform disorder.

Landman also received his routine health care inside the penitentiary during the relevant time

frame. The "Listing" for somatoform disorder indicates that a person who suffers from the condition normally complains of physical symptoms for which there are no demonstrable organic findings. Landman's records show that until 2000, he regularly complained about and received care for his acid reflux. In 2000, Landman began to receive chronic care for his COPD but reported "no acute problems." AR 215. In June, 2000 although Landman reported a history of low back pain, hearing problems and tinnitus, he reported no acute problems. AR 214. In July, 2000, Landman told the physician's assistant he was "getting along pretty good." AR 213. The ALJ correctly found these routine visits are not indicative of somatoform disorder.

In November, 2000, Landman told the prison PA he'd been diagnosed with Meniere's disease. AR 211. Landman reported hearing loss, tinnitus and vertigo. Landman told the PA, however, that he "does not hear the tinnitus any longer." *Id.* The PA prescribed Antivert. *Id.* A month later, Landman reported he was "real pleased" with the way the Antivert controlled his Meniere's disease. AR 210. In January, 2001 Landman reported he was doing well and denied any problems. AR 209. In April, 2001, Landman showed no signs of vertigo and the remainder of his exam was unremarkable. AR 207. In July, 2001 Landman reported occasional bouts of vertigo but that things were going fairly nicely. AR 204. In October, 2001, Landman told the PA things were going nicely and that his Meniere's disease was "pretty stable." AR 193. Landman was ambulating with a normal gait, his COPD had improved, and the PA saw no signs of vertigo. *Id.*

Landman's mental health records do not support a finding that he suffered from somatoform disorder by his date last insured. Meniere's disease is the only physical problem appearing in the records with regularity which could potentially support a somatoform disorder diagnosis affecting the credibility of Landman's claims. But the ALJ found Meniere's was one of Landman's severe impairments, credited Landman's testimony regarding his Meniere's symptoms and incorporated appropriate physical restrictions into Landman's residual functional capacity assessment. (AR 501-02).[20] Landman has failed to show reversible error.

_____

[20]For example the ALJ limited Landman to never climbing ladders, ropes or scaffolds and never working at unprotected heights or around moving mechanical parts. The RFC also limited

### 3. The RFC Determination

"The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of the treating physicians and others, and an individual's own description of his limitations." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).

Landman asserts the ALJ failed to consider his back, neck, shoulder and joint injuries which caused him significant and sometimes radiating pain in 1996 and 2001. Although Landman testified during the 2009 administrative hearing that he had significant neck and back pain during the relevant time frame, the records to which he refers in his brief do not support his claim. The ALJ specifically noted that despite Landman's claim at the hearing that he had persistent musculoskeletal pain during the relevant time, the only complaints noted in the prison health system progress notes appear after a slip and fall in 2001 and quickly resolved. AR 498. The RFC need only contain limitations which are based on relevant, credible evidence in the record. The ALJ is not required to include limitations which are not supported by the record as a whole. *Goff v. Barnhart*, 421 F.3d 785, 793-94 (8th Cir. 2005).

Landman's assertion that the ALJ erred by failing to consider that the VA agreed, in October 2000, to waive payment of his life insurance premiums based on his total disability is unpersuasive. The VA based its decision to waive premiums on the certification of Dr. Weitzenkamp, (AR 660) whose opinion this Court has already determined is entitled to no weight in this proceeding. The VA did not award Landman disability benefits, it merely waived his obligation to pay insurance premiums.[21] Even if the VA awarded disability benefits, the ALJ was not bound by the VA's assessment of Landman's disability. *Fisher v. Shalala*, 41 F.3d 1261, 1262 (8th Cir. 1994). *See also* 20 C.F.R. § 404.1504(same).

---

Landman to avoiding loud background noise. AR 495-96. Landman's assertion in the next section, therefore, that the ALJ did not appropriately consider his hearing or tinnitus "which would have made it impossible for him to work in a loud assembly room or production line with potentially hazardous machinery" is simply wrong.

[21]The VA repeatedly denied Landman's applications for disability benefits, except a 30% rating for COPD. *See* AR 244-261.

Finally, Landman asserts the DOT descriptions of the occupations identified by the vocational expert are inconsistent with RFC hypothetical formulated by the ALJ. The vocational expert identified five occupations[22] which were compatible with the RFC hypotheticals as described by the ALJ. The hypotheticals included a restriction limiting Landman to "understanding, remembering and carrying out short, simple instructions . . ." The occupations identified by the VE were all unskilled and either light or sedentary duty jobs. Landman asserts that contrary to Social Security Policy Interpretation Ruling (SSR) 00-4p, the vocational evidence was inconsistent with the terms of the Dictionary of Occupational Titles (DOT).

The Social Security Regulations (20 C.F.R. § 404.1568) define the skill levels as implemented by the Social Security Administration. Section 404.1568(a) defines unskilled work as follows:

> **(a) Unskilled Work.** Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 20 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.

SSR 004-p addresses the use of a vocational expert in disability decisions. The ruling emphasizes that before relying on a VE, the ALJ must obtain reasonable explanation for any conflicts between the VE's testimony and information in the Dictionary of Occupational Titles and explain in the written decision how any conflict was identified and resolved. Regarding the skill level required for a particular occupation identified by the VE, SSR 004-p states:

> [The ALJ] may not rely on evidence provided by a VE . . . if that evidence is based on underlying assumptions or definitions that are inconsistent with our regulatory policies or definitions. For example:

---

[22]The five occupations were: small products assembler (DOT 739.687-030); inspector packager (DOT 559.687-074); production assembler (DOT 706.687-010); jewelry preparer (DOT 700.687-062) and circuit board assembler (DOT 726.684-010).

***

•Skill Level

A skill is knowledge of a work activity that requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation that is above the unskilled level (requires more than 30 days to learn). (See SSR 82-41). Skills are acquired by PRW and may also be learned in recent education that provides for direct entry into skilled work. The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 C.F.R. 404.1568 . . . unskilled work corresponds to an SVP of 1-2, semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT. Although there may be a reason for classifying an occupation's skill level differently than in the DOT, the regulatory definitions of skill levels are controlling. For example, VE or VS evidence may not be relied upon to establish that unskilled work involves complex duties that take many months to learn, because that is inconsistent with the regulatory definition of unskilled work. See 20 C.F.R. § 404.1568 . . .

***

The occupations listed in Dictionary of Occupational Titles are each coded with several codes in addition to the SVP codes.[23] *See* Appendix C, Components of the Definition Trailer, Dictionary of Occupational Titles. The SVP codes referenced in both the Social Security Regulations and the DOT refer to the "time needed to learn the techniques, acquire the information, and develop the facility needed for the average work performance." *Hulsey v. Astrue,* 622 F.3d 917, 923 (8th Cir. 2010).

The more detailed and multi-faceted GED code "represents those aspects of education (formal and informal) which are required of a worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective . . The GED scale is composed of three divisions: Reasoning Development,[24] Mathematical Development and Language Development . . . The Commissioner's rulings do not correlate GED levels with any

---

[23] Important here is the GED code, which contains three sub-parts.

[24] The reasoning development level within the GED code "corresponds to the ability to follow instructions and solve problems that is required for satisfactory job performance." *Hulsey v. Astrue,* 622 F.3d 917, 923 (8th Cir. 2010).

particular skill level of work." *Anderson v. Astrue*, 2011 WL 3843683 (S.D. Ala.) at *2, fn. 5.

Landman asserts that because all of the jobs identified by the VE contain a GED reasoning development level of two,[25] they are inconsistent with the ALJ's hypothetical which described his ability to understand, remember and carry out short, simple instructions. Landman's position has been rejected by several Courts, including *Anderson,* cited above, the Eighth Circuit and the District of Minnesota.

> When expert testimony conflicts with the DOT, and the DOT classifications are not rebutted, the DOT controls. *Porch v. Chater,* 115 F.3d 567, 572 (8th Cir. 1997). However, definitions of particular jobs in the DOT represent approximate, maximum requirements for each position. *See Young v. Apfel,* 221 F.3d 1065, 1070 (8th Cir. 2000). As such, DOT classifications can be rebutted with VE testimony showing that a particular job might be of a type the claimant could perform. *See Montgomery v. Chater,* 69 F.3d 273, 276 (8th Cir. 1995). In fact, reliance on the DOT as a definitive authority on job requirements is misplaced, however, for DOT definitions are simply generic job descriptions that offer the appropriate maximum requirements for each position rather than their age. *Hall v. Chater,* 109 F.3d 1255, 1259 (8th Cir. 1997). The DOT itself cautions that descriptions may not coincide in every respect with the contents of jobs as performed in particular establishments or at certain localities. In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT. *Russell v. Astrue,* 626 F.Supp.2d 921, 945 (D. Minn. 2009).

*Gufstafson v. Astrue,* 2011 WL 6219641 (D. Minn.) at *6. Important in *Gufstafson* and distinguishing it from *Hulsey* was that the claimant did not suffer borderline intellectual functioning.

Landman testified his use of albuterol inhalers affected his ability to concentrate (a complaint the ALJ apparently credited in formulating the RFC ) but there is no evidence that he has borderline intellectual functioning. On the contrary, the record reflects Landman is relatively well-educated

---

[25]A GED reasoning development level one requires the ability to "apply commonsense understanding to carry out simple one or two step instructions [and] deal with standardized situations with occasional or no variables in or from these situations encountered on the job." A GED reasoning development level two occupation requires applying "commonsense understanding to carry out detailed but uninvolved written or oral instructions" and dealing with "problems involving a few concrete variables in or from standardized situations." http://www.occupationalinfo.org/appendxc_1.html#III

and articulate.

The ALJ limited Landman to performing jobs which required only "understanding, remembering and carrying out short, simple instructions . . ." The jobs identified by the VE in this case were limited to light, unskilled work but which required a reasoning level of two. "Numerous other courts have concluded that an RFC allowing a party to perform simple, routine and repetitive tasks does not prohibit the performance of jobs requiring a reasoning level of two." *Id.* at *7 (listing cases). *See also Hillier v. Social Security Administration*, 486 F.3d 359, 367 (8th Cir. 2007) (claimant limited to following 'simple, concrete instructions' not inconsistent with VE's testimony she could work as a cashier; DOT description included reasoning level of three); *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (claimant's limitation to unskilled work which required nothing more than "simple, concrete instructions" consistent with VE's identified unskilled job requiring a reasoning level of three because "[t]he jobs in question are both classified as unskilled and so do not appear to be 'complex.'"). The ALJ's reliance on the VE's testimony identifying jobs within Landman's RFC is supported by substantial evidence.

### CONCLUSION and ORDER

For the reasons explained above, the Commissioner's denial of benefits is AFFIRMED. The Plaintiff's Complaint is DISMISSED with prejudice and on the merits. Accordingly, it is ORDERED:

(1)     Plaintiff's Motion for Summary Judgment (Doc. 16) is DENIED;
(2)     The Plaintiff's Complaint is DISMISSED with prejudice;
(3)     The Clerk shall enter a Judgment in accordance with this Memorandum Opinion and Order.

Dated this 24th day of September, 2013.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
Deputy